UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BETTY L. FOX,                              )
                                           )
                    Plaintiff,             )
                                           )
        v.                                 )   CASE NO. 1:06-cv-0730-DFH-JMS
                                           )
MICHAEL J. ASTRUE,                         )
Commissioner of the Social                 )
Security Administration,[1]                )
                                           )
                    Defendant.             )

ENTRY ON JUDICIAL REVIEW

        Plaintiff Betty L. Fox seeks judicial review of the Commissioner of Social
Security's final decision denying her disabled widow's insurance benefits under
the Social Security Act, 42 U.S.C. § 402(e).   Acting for the Commissioner, an
Administrative Law Judge ("ALJ") determined that Mrs. Fox's degenerative disc
disease was a severe impairment.  The ALJ concluded, however, that Mrs. Fox was
not disabled under the Social Security Act because she retained the residual
functional capacity to perform a significant range of sedentary work.   Mrs. Fox
contends that the ALJ erred in giving controlling weight to the opinion of a
consulting physician rather than to that of her personal physician.   For the

---

[1]Michael J. Astrue took office as Commissioner of the Social Security
Administration while Mrs. Fox's case was pending before the court. Commissioner
Astrue is substituted as the defendant in this action pursuant to Rule 25(d) of the
Federal Rules of Civil Procedure.

reasons explained below, the court finds no error and affirms the denial of benefits.

*Background*

Mrs. Fox was born in 1943 and was sixty-two years old when the ALJ denied her application for disabled widow's insurance benefits. R. 13. She graduated from high school and received limited vocational training in food service supervision. R. 78, 92. Mrs. Fox worked in food service from 1964 until 1992, when she left a supervisory position to care for her ailing mother. R. 86-87. Mrs. Fox gave conflicting accounts of what this work entailed, R. 73, 87, 98, but vocational expert Tina Stambaugh characterized Mrs. Fox's duties as requiring light or medium exertion. R. 266-67. Mrs. Fox claims that she became physically unable to work in early 1999, though her back conditions bothered her as early as 1994. R. 86.

On April 4, 1996, Mrs. Fox visited Jennings Family Care complaining of increasing pain in her left hip. R. 122. Dr. David Nickerson noted that an earlier x-ray of Mrs. Fox's hip was normal and showed no signs of osteoarthritis or other impairments. *Id.* Notwithstanding the unremarkable x-ray, Dr. Nickerson referred Mrs. Fox to an orthopedic surgeon, Dr. Larry Olson, of Southern Indiana Orthopedics. R. 137-38. Dr. Olson ordered a lumbar myelogram on June 20, 1996, and diagnosed Mrs. Fox with grade I spondylolisthesis at L-4 and segmental spinal stenosis at L4-5. R. 139. Dr. Olson also administered two epidural steroid

injections to Mrs. Fox to control her lower back, hip, and leg pain.  R. 138, 140.
Mrs. Fox was reluctant to pursue recommended operative treatment at this point,
choosing instead to try to control her pain with a combination of medication,
special exercises, and weight management.  R. 123.

Mrs. Fox was unhappy with the treatment she received from Dr. Olson.  She
complained that the epidural injections hurt her.  R. 141.  She refused to return
to Dr. Olson's office because "all he wants to do is cut on her."  R. 123.  On
March 26, 1997, Mrs. Fox visited Jennings Family Care for medication refills.  The
treating physician noted that she had only a slightly decreased flexion; her
reflexes, rotation, lateral movement, and straight leg raises were all normal.  The
physician prescribed Relafen for her osteoarthritis but did not refill her
hydrocodone prescription.  The physician told Mrs. Fox to continue her exercises
and weight loss.

Mrs. Fox did not seek treatment for back, hip, or leg pain in 1998.  She
visited Jennings Family Care several times to receive treatment for upper
respiratory ailments and other minor maladies, R. 124, 126, but her osteoarthritis
remained "stable" until early 1999.  R. 124.  On January 8, 1999, she visited Dr.
Darryl Tannenbaum, an orthopedist at Jennings Community Hospital, to seek
treatment for pain in her left buttock.  R. 141.  Dr. Tannenbaum noted that Mrs.
Fox had a slight limp and "can't walk very far."  Her straight leg raise revealed
some pain and tightness around 70-80 degrees, but her range of motion was

normal and she was "neurovascularly intact throughout." Dr. Tannenbaum also diagnosed spondylolisthesis and spinal stenosis, and he spoke with her about decompressive procedures. He also recommended a third epidural steroid injection and urged Mrs. Fox to quit smoking before considering major spinal surgery. During a follow-up visit on January 29, 1999, Dr. Tannenbaum referred Mrs. Fox to Dr. John Chambers, another orthopedist. R. 142.

On February 1, 1999, Mrs. Fox told Dr. Chambers that she had reached a level of pain she felt she could not continue to tolerate. R. 145. Dr. Chambers's examination revealed that Mrs. Fox's left and right rotation, lateral bending, and forward flexion were "not significantly limited." He also found that Mrs. Fox retained full range of motion and "very brisk" deep tendon reflexes in her arms and legs. In the interest of a more thorough assessment, however, Dr. Chambers recommended a lumbar myelogram.

The myelogram revealed multiple levels of stenosis, including L2-3 and L3-4; disc herniation; and a large generalized disc bulge at L4-5 that was secondary to Mrs. Fox's spondylolisthesis. R. 143. On February 12, 1999, Dr. Chambers recommended surgery consisting of a posterior spinal decompression and fusion with instrumentation. R. 146. On March 16, 1999, Dr. Chambers and Dr. Olson performed a posterior spinal decompression at L2-L5, a posterior spinal instrumentation at L3-L5, a posterior lateral fusion at L3-L5, and a right iliac crest bone graft via a separate fascial incision. R. 148.

Mrs. Fox visited Dr. Chambers six weeks after the surgery.  R. 146.  Dr. Chambers noted that Mrs. Fox had  "good improvement of her back and leg pain" and was "doing quite well clinically."  X-rays showed "excellent" alignment of Mrs. Fox's internal fixation and early bone graft formation.

On June 14, 1999, three months after her surgery, Mrs. Fox was still "doing quite well clinically."  R. 147.  However, she had some complaints about sacroiliac pain, which Dr. Chambers believed was related to her surgery.  Dr. Chambers increased Mrs. Fox's pain medication and reminded her to continue her exercises. By September 13, 1999, Mrs. Fox was able to walk without much difficulty despite having a "significant amount of low back and hip complaints."  Because Mrs. Fox's complaints about numbness and tingling in her upper extremities suggested cervical myelopathy, Dr. Chambers ordered a cervical MRI.

The cervical MRI revealed significant spurring at C5-6 and C6-7.  R. 151. It also showed central disc bulge and right- and left-sided foraminal narrowing. Dr. Chambers diagnosed Mrs. Fox with early cervical myelopathy on October 28, 1999, and administered a bursa injection of Depo-Medrol to reduce Mrs. Fox's pain.  R. 153.  Mrs. Fox visited Jennings Family Care on January 25, 2000, reporting that she experienced back discomfort if she stood or walked for long periods of time.  R. 132.  Dr. John Schuck advised her to begin walking to strengthen her back.  R. 133.  He told her to begin with one minute per day and suggested she increase the amount of time by one minute every two weeks.

Mrs. Fox's right iliac pain responded to the bursa injection, but she complained of flare-up pain on February 17, 2000.  R. 154.  Dr. Chambers did not observe changes in her gait or her neurologic signs.  He noted that Mrs. Fox had "really done quite well" in responding to her March 16, 1999 surgery, but that she would have some back pain with "prolonged sitting."  Dr. Chambers prescribed Vicodin for pain management during long trips, and he recommended that Mrs. Fox take breaks from sitting every one to two hours.

On September 7, 2000, Dr. Chambers noted that Mrs. Fox was "doing well from her back."  R. 155.  "Her legs have improved, but she still does have some appropriate back pain . . . ."  At an October 4, 2000, "well-woman" exam at Jennings Family Care, Mrs. Fox denied joint stiffness, pain, and restriction of movement.  R. 134.  There was no tenderness in her back.  R. 135.  The treating physician noted that Mrs. Fox had an "ambulatory normal gait" and could move all extremities.  R. 136.

Mrs. Fox applied for disability benefits on March 6, 2001.  R. 80.  Disability Field Office interviewer Donna Skrypak conducted a telephone interview with Mrs. Fox and, observing no difficulties, noted Mrs. Fox's complaints about her back.  R. 83.  Consulting physician Dr. Sandeep Gupta examined Mrs. Fox on May 5, 2001.  R. 218.  He deemed Mrs. Fox's gait "unremarkable" and her reflexes normal.  R. 219.  The only limits he found concerned Mrs. Fox's dorsolumbar extension and her hip flexions.  R. 220. The Regional Commissioner notified Mrs.

Fox in a July 25, 2001, letter that she was not disabled on any date through June 30, 1997, the last date for which she was insured for disability benefits.  R. 26-29.

"Well-woman" exams at Jennings Family Care on September 12, 2001, and September 19, 2002, revealed no back tenderness or deformities.  R. 185, 188. The treating physician on September 19, 2002, noted that Mrs. Fox exhibited chronic disc degeneration as well as chronic use of sleep and pain medications. R. 189.

Mrs. Fox visited Dr. Chambers for a follow-up visit on December 31, 2001. R. 211.  She was still "doing relatively well clinically," but her pain was "progressively worsening."  X-rays showed junctional disease at the L2-3 and L1-2 segments.  She and Dr. Chambers agreed to try conservative pain management before proceeding with a revision surgery.  Dr. Chambers prescribed Vicodin ES for her pain and advised her to contact the office if her pain worsened.

The record indicates no contact between Mrs. Fox and Dr. Chambers prior to her regular appointment on June 28, 2002.  On that date, she reported significant back pain and claimed that the five to six Vicodin tablets she was taking daily did not control her pain.  R. 212.  Dr. Chambers's exam revealed that Mrs. Fox experienced a significant limp when she walked, but he noted that she remained neurologically intact.  X-rays showed progressive instability at the L2-3

level.  Dr. Chambers prescribed Oxycontin and told Mrs. Fox to continue the Vicodin intermittently.

The Oxycontin proved "markedly beneficial" for Mrs. Fox, Dr. Chambers opined on December 27, 2002.  R. 213.  Dr. Chambers reported that Mrs. Fox was "really doing quite well clinically" and could perform day-to-day activities until about 4:00 p.m.  Because Mrs. Fox's pain was "well controlled" with the Oxycontin and she was "so active," Dr. Chambers was reluctant to change her course of treatment or to pursue further intervention.

Mrs. Fox applied for disabled widow's insurance benefits on April 15, 2003. R. 61.  Consulting physician Dr. Lebnan Saad examined her on May 31, 2003. R. 221.  Dr. Saad noted that Mrs. Fox was able to rise from a seated position without limitation.  R. 222.  He observed that she did not use an assistive device to walk, but walked slightly slowly for her age and had some balance problems. Dr. Saad also found slightly decreased ranges of motion in Mrs. Fox's hip and lower back flexions.  Dr. Saad concluded that Mrs. Fox could sit without limitation but was unable to perform prolonged walking and standing, a conclusion that echoed Mrs. Fox's self-assessment.  R. 221-22.  Dr. Saad recommended further investigation of Mrs. Fox's older x-rays and scans.  R. 222.

On June 25, 2003, Medical Consultant Dr. A. M. Dobson provided a residual functional capacity assessment based on Mrs. Fox's medical records.  R.

224-31.  Dr. Dobson opined that Mrs. Fox could sit and walk for about six hours each during an eight-hour workday.  R. 225.  Unlike Dr. Saad, who said Mrs. Fox's pain limited her ability to push and pull, Dr. Dobson said that Mrs. Fox could push and pull without limitation.

Mrs. Fox visited Dr. Chambers on December 10, 2003.  R. 237.  He observed that she was doing "relatively well clinically" on Oxycontin with Vicodin for breakthrough pain.  He decided to keep her on the Oxycontin but noted that he might have to refer her to another physician for chronic pain management.  During her June 9, 2004, follow-up visit, Dr. Chambers repeated that Mrs. Fox was doing "relatively well clinically."  R. 238.  He also noted, however, that she had significant breakdown above her fusion and increasing pain.  He prescribed Oxy IR to control her recurrent afternoon pain.

On her next visit, December 18, 2004, Mrs. Fox told Dr. Chambers that her pain was "intolerable."  R. 239.  Dr. Chambers diagnosed her with junctional disease and doubled her dosage of Oxycontin.  He recommended that she have her spinal fusion surgically extended into her thoracic spine.  Mrs. Fox declined to pursue operative treatment, but reported increasing pain to Dr. Chambers on June 16, 2005.  R. 242.  She had not been taking the increased dosage of Oxycontin Dr. Chambers prescribed in December 2004, however, because she could not afford to do so.  She remained neurologically intact and told Dr. Chambers that she was "happy with what the 40 mg of OxyContin was doing."

Dr. Chambers completed a questionnaire assessing Mrs. Fox's ability to do work-related activities on February 2, 2005. R. 234, 236. In his opinion, Mrs. Fox's severe junctional spine disease limited her to less than two hours each of sitting and standing each day. R. 234. He also opined that she would need to change positions every thirty minutes, and walk for ten minutes in between each position change. R. 235. Dr. Chambers further said that Mrs. Fox would need to lie down several times daily at unpredictable intervals and would probably be absent from work more than three times monthly. R. 235-36.

### Testimony at the Hearing

Mrs. Fox testified before the ALJ on August 25, 2005, that her pain was getting worse and more intense. R. 249, 254. She claimed that she was no longer able to sit comfortably for more than five minutes, R. 256, and that she had to have something to lean on if she wanted to walk very far. R. 255. Mrs. Fox described leaning on her sister's walker and using an automated cart at the grocery store. *Id.* She told the ALJ that she had difficulty sleeping, cooking, and doing laundry. R. 257, 264. She explained that her sister and niece had helped her with her daily activities for several years. R. 255.

The ALJ asked Mrs. Fox about her repeated refusal to pursue further surgical treatment. R. 258. Mrs. Fox testified that Dr. Chambers had recently told her that surgery would not help control her pain. She also explained that she did not have medical insurance and believed she would be unable to pay for a

second surgery.  R. 259.  She testified that she was in pain about 95 percent of the time, R. 260, and told the ALJ that she "still can't do anything" because the Oxycontin and oxycodone did not completely take away her pain.  R. 258-59.

Vocational expert Tina Stambaugh testified that Mrs. Fox's past relevant work generally required light exertion but that Mrs. Fox's particular former duties would be more accurately classified as necessitating medium exertion.  R. 266-67. Stambaugh said that Dr. Dobson's assessment would permit Mrs. Fox to perform her past relevant work as it is typically classified, but not as she performed it.  R. 267.  Stambaugh concluded, however, that Dr. Saad's opinion would wholly preclude Mrs. Fox's past relevant work.  *Id.*

Stambaugh testified that under either Dr. Dobson's or Dr. Saad's assessments, Mrs. Fox would be capable of performing jobs at the sedentary level. She also said that Mrs. Fox had some transferable vocational skills that could be applied to jobs including billing clerk, office clerk, and receptionist.  R. 267-68. According to Stambaugh, 4,700 billing clerk jobs existed in Indiana, while 221,000 existed nationally.  Roughly 18,200 general office clerk jobs were available in Indiana, with 900,900 available nationwide.  R. 268.  There were about 11,800 receptionist jobs in Indiana, and 586,300 nationwide.  Stambaugh further confirmed that those jobs could accommodate a sit/stand option.

Stambaugh testified that Dr. Chambers's assessment of Mrs. Fox's abilities would preclude her from doing all competitive work.  R. 268.  Stambaugh said that Mrs. Fox's own testimony at the hearing was most in line with Dr. Chambers's opinion of her residual functional capacity and would generally preclude all work.  Stambaugh based this opinion on Mrs. Fox's testimony that her maximum sustained activity was about one and a half hours, and that she would require forty-five minutes of rest after being that active.  R. 268-69.  Stambaugh further noted that the probable maximum number of allowable monthly absences at any competitive job would be one.  R. 268.

## Procedural History

ALJ Deborah Smith issued her decision denying Mrs. Fox's application on September 22, 2005.  R. 9-11.  Because the Appeals Council denied further review of the ALJ's decision, R. 4-6, the ALJ's decision is treated as the final decision of the Commissioner.  *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  Mrs. Fox filed a timely petition for judicial review under 42 U.S.C. § 405(g).

## The Statutory Framework for Determining Disability

The ALJ determined that Mrs. Fox met the non-disability requirements for disabled widow's insurance benefits set forth in 42 U.S.C. § 402(e).  R. 17.  To qualify for benefits, Mrs. Fox also had to demonstrate that she was "disabled,"

meaning that she was unable to perform any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that had lasted or could be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  Mrs. Fox was disabled only if her impairments were of such severity that she was unable to engage in work she had done previously and if, based on her age, education, and work experience, she also could not engage in any other kind of substantial work existing in the national economy, regardless of whether such work existed in her immediate area, or whether she would be hired if she applied for work.  42 U.S.C. § 423(d)(2)(A).

This eligibility standard is a stringent one; the Social Security Act neither contemplates degrees of disability nor allows for an award based on a partial disability.  *Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1989).  Thus, even claimants who suffer substantial impairments are not automatically entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful.

The implementing regulations for the Act provide a five-step process to use in evaluating disability.  The steps are:

(1)    Has the claimant engaged in substantial gainful activity?  If so, she was not disabled.

(2)     If not, did the claimant have an impairment or combination of impairments that are severe?  If not, she was not disabled.

(3)     If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

(4)     If not, could the claimant do his past relevant work?  If so, she was not disabled.

(5)     If not, could the claimant perform other work existing in significant numbers in the national economy given her residual functional capacity, age, education, and experience?  If so, then she was not disabled.  If not, she was disabled.

See generally 20 C.F.R. § 404.1520.  When this test is applied, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

Applying the five-step process, the ALJ found that Mrs. Fox satisfied step one because she had not engaged in substantial gainful activity since her alleged onset date of disability.  R. 17.  At step two, the ALJ found that Mrs. Fox had a severe impairment:  degenerative disc disease of the lumbar and cervical spine.  At step three, the ALJ found that Mrs. Fox failed to demonstrate that her impairment met or equaled one of the qualifying impairments listed in Social Security regulations.  At step four, the ALJ found that Mrs. Fox could not perform her past relevant work.  At step five, the ALJ found that Mrs. Fox retained the ability to perform a significant range of sedentary work and was not disabled.

*Standard of Review*

The Social Security Act limits the scope of judicial review. If an ALJ's decision is both supported by substantial evidence and based on the proper legal criteria, a reviewing court must uphold it.  42 U.S.C. § 405(g); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), quoting *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reassessing the facts or the credibility of witnesses.  *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000). The court must examine the evidence that favors the claimant as well as the evidence that supports the ALJ's conclusion.  *Zurawski*, 245 F.3d at 888.  Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the ALJ's resolution of the conflict. *Binion ex rel. Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions.  *Sarchet v. Chater*, 78 F.3d 305,

-15-

309 (7th Cir. 1996). Also, the ALJ must explain the decision with "enough detail and clarity to permit meaningful appellate review." *Briscoe*, 425 F.3d at 351. Although the ALJ need not provide a full written evaluation of every piece of testimony and evidence, *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005), a remand may be required if the ALJ has failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002), quoting *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

## *Discussion*

Mrs. Fox's primary argument is that the ALJ erred by not giving controlling weight to the opinion of her treating physician, Dr. Chambers. Mrs. Fox also contends that the ALJ neglected to consider all relevant evidence and impermissibly "played doctor" by drawing her own medical conclusions.

I.    *Opinion of Mrs. Fox's Treating Physician*

Dr. Chambers completed a residual functional capacity evaluation for Mrs. Fox on February 2, 2005. See R. 234-36. He opined that she was incapable of sitting, standing, or walking more than two hours per day. R. 234. He stated that she was unable to twist, stoop, crouch, reach, push, or pull. R. 235-36. He also stated that Mrs. Fox would need to lie down several times daily at unpredictable intervals and miss more than three days of work per month. These restrictions, if credited, would render Mrs. Fox  disabled.

An ALJ is required to give controlling weight to the opinion of a treating source if the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and is not contradicted by other substantial medical evidence in the record.  SSR 96-2p; see also *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) ("ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record").  An ALJ may discount a treating source's opinion if it is inconsistent with the opinion of a consulting physician or if the treating source's opinion is internally inconsistent, as long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability."  *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004), quoting *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). Even if a treating source's medical opinion is well-supported by medically acceptable evidence in the record, the ALJ need not give the opinion controlling weight if it is inconsistent with other substantial evidence in the record.  *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); SSR 96-2p.

The ALJ adequately articulated her reasons for not giving controlling weight to Dr. Chambers's opinion.  The ALJ explained that Dr. Chambers's opinion was contrary both "to his treatment notes and the signs and findings of record." R. 16. First, the ALJ found that Dr. Chambers's assessment, which contained little explanation or reasoning beyond circled and check-marked answers to form questions,  R. 234-36, was not well supported by his own medical findings.  She pointed to several comments representative of Dr. Chambers's routinely optimistic

treatment notes and noted their divergence from his opinion of Mrs. Fox's much more limited residual functional capacity.  R. 16.

Mrs. Fox contends that the ALJ's examples, comments like "doing relatively well clinically" and "good fusion," R. 16, are merely "vague and general statements" found in the record alongside more specific descriptions of Mrs. Fox's pain.  Pl. Br. 4.  These statements, "vague" though they may be, are present throughout Dr. Chambers's treatment notes and are objectively supported by x-rays, neurological assessments, and other medically acceptable diagnostic techniques, including clinical examinations.   R. 146-47, 152-55, 211, 213, 237-38, 242.   Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the ALJ's reasoned resolution of the conflict.  *Binion,* 108 F.3d at 782.

Second, the ALJ found that Dr. Chambers's opinion of Mrs. Fox's residual functional capacity was inconsistent with the opinions of the consulting physicians.  R. 16.  When treating and consulting physicians present conflicting opinions, the ALJ may decide whom to believe, provided that substantial evidence supports her decision.  *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001).  The law does not give automatic priority to the opinion of a treating physician over that of a consulting physician; the relative merits of both must be considered.  *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).  Moreover, an ALJ need not

defer to a treating physician's determination of a claimant's residual functional capacity.  20 C.F.R. § 404.1527(e)(2).

The ALJ considered the opinions of both Dr. Chambers and Dr. Saad.  R. 14-16.  Indeed, she devoted nearly a full page of her opinion to explaining the relative weights she assigned them.  R. 16.  Dr. Saad's opinion is consistent with the body of evidence in the record.  The functional limitations prescribed by Dr. Saad, supported by his own examination of Mrs. Fox, are generally consistent with those provided by state agency physicians Dr. Gupta, R. 218-20, and Dr. Dobson. R. 225-26.  They also accord with Mrs. Fox's self-assessment of her ability to sit without limitation, R. 221, and her positive response to her prescribed 40 mg dosage of Oxycontin.  ("She is happy with what the 40-mg. [sic] of Oxycontin was doing.") R. 242.  Dr. Saad's objective assessments of Mrs. Fox, R. 221-22, mirror those obtained by Jennings Family Care physicians during Mrs. Fox's annual "well-woman" exams from 1999 to 2002, R. 175-76, 181-82, 184-85, 188-89, lending further credence to his residual functional capacity assessment.  Because the ALJ's resolution of this issue is supported by substantial evidence, and the opinions of both Drs. Chambers and Saad were sufficiently considered, the ALJ acted within her discretion in giving Dr. Saad's opinion controlling weight.

II.    *Consideration of Relevant Evidence*

Mrs. Fox contends that the ALJ failed to consider all relevant evidence when assessing her benefits eligibility.   Specifically, Mrs. Fox claims that the ALJ

ignored evidence of her severe junctional disease, cervical disc abnormalities, and pathologic reflexes of her upper extremities that occurred after her 1999 surgical fusion.  Pl. Br. 5.

An ALJ may not select and discuss only the evidence that favors her ultimate conclusion.  An ALJ also may not ignore an entire line of evidence that is contrary to the ruling.  See *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (remanding because ALJ improperly ignored three lines of evidence supporting plaintiff's claim).  The ALJ is not required to provide an in-depth analysis of every piece of evidence the claimant provides.  *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995).  The ALJ must minimally articulate reasons for rejecting or accepting specific evidence of disability so that a reviewing court can trace the path of the ALJ's reasoning.  *Id.*  The question is not whether the ALJ discussed every piece of evidence; it is whether she built an accurate and logical bridge between the evidence in the record and the result she reached.  *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

The ALJ did not ignore significant medical evidence when determining Mrs. Fox's disability status.  On the contrary, she expressly addressed the very evidence Mrs. Fox asserts was omitted.  The ALJ noted Mrs. Fox's junctional disease several times; she discussed Mrs. Fox's testimony about the condition, R. 15,  as well as Dr. Chambers's opinion about its effect on her ability to work and his recommendation to extend Mrs. Fox's fusion to ameliorate it.  R. 16.  The ALJ

-20-

devoted most of one paragraph of her opinion to Mrs. Fox's cervical disc abnormalities, summarizing Mrs. Fox's cervical MRI results and noting Dr. Chambers's diagnosis of early cervical myelopathy.   R. 13.   The ALJ also acknowledged Mrs. Fox's complaints about her upper extremities, noting that she claimed to experience both "numbness and tingling in the arms," *id*, and "sleep[ing]" and "jumping" hands. R. 15.

Although the ALJ did not mention specifically Dr. Chambers's observations of a positive Hoffman's sign, R. 147, 153, this omission does not rise to the level of "failure to consider an entire line of evidence." *Diaz*, 55 F.3d at 307.   The ALJ discussed evidence spanning the full record, noting positive findings ("doing relatively well") as well as negative ("some balance problems").   R. 14.   Her reasoned analysis incorporating findings from throughout the record meets the minimal level of articulation required.   It also forms a sufficiently accurate and logical bridge between the body of evidence and her conclusion.  *Steele*, 290 F.3d at 941.  The ALJ's omissions do not warrant remand.  See, *e.g.*, *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).

III.   *"Playing Doctor"*

Mrs. Fox's final contention is that the ALJ inappropriately drew her own medical conclusions from the evidence.   Mrs. Fox argues that the ALJ was impermissibly "playing doctor" by concluding that various aspects of Dr.

Chambers's findings were incongruous and by rejecting his opinion.  See *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).

An ALJ may not make independent medical findings regarding the consistency of certain activities with a particular medical diagnosis.  *Rohan*, 98 F.3d at 970.  Likewise, an ALJ may not substitute his or her own layperson's medical judgment for a physician's judgment about medical issues.  *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).  At the same time, ALJs are required to consider all legally relevant evidence, and it is the ALJ's responsibility to determine how much credence to afford particular pieces of evidence.  *Diaz,* 55 F.3d at 309.  The ALJ is not required to accept uncritically all conclusions reached by anyone with a medical degree, but must evaluate the evidence presented and must at least "minimally articulate" why evidence supporting claimants is not sufficiently persuasive to find disability.  *Skarbek*, 390 F.3d at 503.

In this case, the ALJ did not "play doctor" by discounting Dr. Chambers's opinion.  In giving "little weight" to Dr. Chambers's opinion, the ALJ cited a multitude of medical evidence, including Dr. Chambers's own treatment notes and Dr. Saad's conflicting opinion, that contradicted his opinion.  R. 16.  Unlike the ALJs in *Rohan* and *Clifford*, the ALJ did not substitute her judgment for that of the treating physician; she discussed inconsistencies and advanced a reasonable interpretation of the record.

Moreover, the ALJ did not reject Dr. Chambers's *diagnosis* of severe junctional disease.  She acknowledged that Mrs. Fox's degenerative disc disease of the lumbar and cervical spine was a "severe impairment."  R. 17.  She rejected Dr. Chambers's restrictive assessment of Mrs. Fox's residual functional capacity, finding that substantial evidence supported Dr. Saad's less restrictive opinion.  R. 16.  The final responsibility for deciding the issue of residual functional capacity lies with the ALJ; she need not defer to the treating physician's determination of the same.  20 C.F.R. § 404.1527(e)(2).

*Conclusion*

Because the ALJ's decision was consistent with the law and supported by substantial evidence, the court affirms the Commissioner's decision.  The court will enter final judgment accordingly.

So ordered.

Date: June 14, 2007

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

G. Gene Arnholt
426 Fifth Street
Columbus, Indiana  47201